IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CORE COMMUNICATIONS, INC.,   *
Plaintiff,          *
              *
              *
   v.         *   Civil No. 1:02-cv-3180-JFM
              *
              *
VERIZON MARYLAND, INC.,    *
Defendant.        *
              *
              *
           ******

CORE COMMUNICATIONS, INC.,   *
Plaintiff,          *
              *
              *
   v.         *   Civil No. 1:08-cv-503-JFM
              *
              *
VERIZON MARYLAND, INC.,    *
Defendant.        *
              *
              *
           ******

MEMORANDUM

These two actions involve a dispute between Core Communications, Inc. and Verizon

Maryland, Inc. under an Interconnection Agreement ("ICA") and the federal

Telecommunications Act.  Civil No.  02-3180 was filed by Core against Verizon.  In that action,

Core sought to recover monetary damages for Verizon's delay in providing telecommunication

interconnection services to Core.  Civil No. 02-3180 was administratively closed for many years

pending resolution of a proceeding Core instituted against Verizon before the Maryland Public

Service Commission ("PSC").  Civil No. 08-503 is a declaratory judgment action filed by

Verizon challenging the PSC's ruling in Core's favor.  On June 30, 2009, in an opinion issued in

Civil No. 08-503, I granted summary judgment in favor of Verizon and vacated the PSC's order.[1]

The Fourth Circuit reversed my ruling.  Upon the remand of Civil No. 08-503, Civil No. 02-3180

was reopened and consolidated with Civil No. 08-503.

Core's claims for fraudulent concealment and unfair competition remain before this court, as

does a damages assessment for Core's breach of contract claim.[2]  The parties have filed cross-

motions for summary judgment.  I grant Verizon's motion—and deny Core's motion—as to the

claims for fraudulent concealment and unfair competition.  I deny Verizon's motion as to breach

of contract damages and hold that Core's damages are not limited to those provided for in section

26.1 of the ICA.

## I.

---

[1] In my June 30, 2009 opinion I held that the PSC had misconstrued federal law and the ICA between Core and Verizon by erroneously evaluating the "equal in quality" standard set by 47 U.S.C. § 251(c)(2)D) and incorporated into the parties' agreement.  I held the PSC improperly assessed the "equal in quality" standard by using the interconnection services Verizon provides to its end-user retail customers as a comparator when it should have used interconnection services Verizon provides to itself and other carriers as the comparator.

[2] At the outset of summary judgment briefing, two additional claims were pending: Core's claim for intentional misrepresentation, and Verizon's declaratory judgment claim that it did not breach an implied duty of good faith and fair dealing.  In its opposition to Verizon's summary judgment motion, Core withdrew its claim for intentional misrepresentation, recognizing that there is no evidence to suggest Verizon made an affirmative misrepresentation.  Prior to summary judgment briefing, Core properly conceded that there is no independent action under Maryland law for breach of a duty of good faith and fair dealing.  *See, e.g., Mount Vernon Props., LLC. v. Branch Banking & Trust Co.,* 907 A.2d 373, 381–82 (Md. Ct. Spec. App. 2006).  I declined to dismiss the declaratory claim, however, because I did not want a dismissal to have an inadvertent effect upon my ultimate decision as to whether Core could recover punitive damages.  Because I address the issue of punitive damages in this Opinion, and in doing so discuss Verizon's alleged bad faith, dismissal of Verizon's claim for declaratory relief that it did not breach an implied duty of good faith and fair dealing is appropriate.

My prior opinion and the opinion of the Fourth Circuit set forth the factual background of the case. *See Verizon Maryland, Inc. v. Core Commc'ns, Inc.*, 631 F. Supp. 2d 690 (D. Md. 2009); V*erizon Maryland, Inc. v. Core Commc'ns, Inc.*, 405 F. App'x 706, 714 (4th Cir. 2010). I will therefore only briefly summarize the facts pertinent to the pending motions.

Core was beginning to enter the local Baltimore telephone market in 1999.  At that time Verizon was the incumbent local exchange carrier ("ILEC") in the market.  The Telecommunications Act of 1996 required Verizon to "interconnect"—that is, to make its existing facilities available—to competing local exchange carriers ("CLECs"), such as Core.  To that end, Verizon was required under federal law to enter into an interconnection agreement ("ICA") with Core.  After the ICA was entered into, Core and Verizon met on August 11, 1999 to begin the interconnection process.  Core requested interconnection at its Wire Center on the tenth floor of the Court Square Building in Baltimore, a so-called "carrier hotel" at which many carriers, including Verizon, have facilities.

At the August 11 meeting Core proposed interconnection using an existing OC-12 Loop Ring and an OC-12 multiplexer.  Use of this equipment would make it unnecessary for Verizon to build new facilities.  Verizon agreed that use of the OC-12 Loop Ring would be technically feasible.  Core asked that September 18, 1999 be the interconnection activation date.

On August 15, 1999, Verizon informed Core that the OC-12 multiplexer that Core proposed Verizon use to interconnect was assigned to another Verizon customer.  In fact, that other customer was Core.  Verizon did not disclose that fact to Core, and Core never mentioned it to Verizon.

Verizon interconnected with Core on December 23, 1999, slightly more than three months after the September 18, 1999 activation date Core originally proposed.

## II.

A court may properly award summary judgment when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008).  A material fact is one that "might affect the outcome of the suit."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine dispute about a material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Id.*  When reviewing a motion for summary judgment, the court must look at the facts and inferences drawn therefrom in the light most favorable to the non-moving party.  *Scott v. Harris*, 550 U.S. 373, 378 (2007).

While the burden is on the moving party to demonstrate the absence of any genuine issue of material fact, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970), "[a] mere scintilla of proof . . . will not suffice to prevent summary judgment."  *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003).  The non-moving party may not merely rest upon allegations or denials in her pleadings but must, by affidavit or other evidentiary showing, set out specific facts showing a genuine issue remains for trial.  Fed. R. Civ. P. 56(e)(2).  A court should enter summary judgment where a nonparty fails to make a sufficient showing to establish the elements essential to the party's claim and on which the party will bear the burden of proof at trial.  *See Celotex,*

4

477 U.S. at 322.  "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

If there is insufficient evidence for a reasonable jury to render a verdict in favor of the non-moving party, there is no genuine issue of material fact, and summary judgment may be granted.  *See Anderson*, 477 U.S. at 248.  The District of Maryland has held that "a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala*, 166 F. Supp. 2d 373, 375 (D. Md. 2001).  Summary judgment is inappropriate, however, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson*, 447 U.S. at 250; *see also JKC Holding Co., LLC v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

## III.

As indicated above, Core asserts claims for fraudulent concealment and unfair competition.  Before addressing the merits of those claims, I will first discuss Verizon's two preliminary arguments: (1) that these tort claims are barred by the ICA's exculpatory provision and (2) that this is a pure breach of contract action barring Core from punitive damages.

### A. Exculpatory Provision

The ICA includes an exculpatory provision,[3] which Verizon argues bars Core from raising a tort claim and recovering punitive damages.  I disagree.

The general rule in Maryland is that "[i]n the absence of legislation to the contrary, exculpatory clauses are generally valid, and that the public policy of freedom of contract is best served by enforcing the provisions of the clause." *Wolf v. Ford*, 644 A.2d 522, 525 (Md. 1994); *see Adloo v. H.T. Brown Real Estate, Inc.*, 686 A.2d 298, 301 (Md. 1996) ("It is well settled in [Maryland], consistent with 'the public policy of freedom of contract,' that exculpatory contractual clauses generally are valid.")  Maryland courts have recognized three exceptions, however, where a contract's exculpatory provision is unenforceable: (1) in the event of intentional or grossly negligent conduct; (2) when the contract is the "product of grossly unequal bargaining power"; or (3) in "transactions affecting the public interest."  *Wolf*, 644 A.2d at 526.

The first two exceptions are inapplicable.  First, Core has put forth no evidence to show that Verizon intended to breach the ICA or breached the ICA through grossly negligent conduct.  Second, Core voluntarily opted-in to an existing, PSC-approved ICA between Verizon and another CLEC and therefore has no basis for a claim of negotiating power imbalance.  Rather than negotiate a new agreement with Verizon, Core decided to adopt the terms of Verizon's (then Bell Atlantic's) agreement with American Communication Services of Maryland, Inc.  If Core

---

[3] Section 26.2 of the ICA states that "[n]either Party shall be liable to the other in connection with the provision or use of services offered under this Agreement for indirect, incidental, consequential, reliance or special damages, including (without limitation) damages for lost profits (collectively, "Consequential Damages"), regardless of the form of action, whether in contract, warranty, strict liability, or *tort* . . . ."(Verizon Opp'n Ex. C at 8, 02-cv-3180 ECF No. 52–7 (emphasis added).)

disapproved of the exculpatory clause in the existing agreement, it could have negotiated its own agreement with Verizon, or at the very least negotiated to remove or alter the clause.

The third exception, a broach public policy exception, applies when there are "exculpatory agreements in transactions affecting the public interest." *Id*.  Although recognizing "general reluctance to invoke the nebulous public interest to disturb private contracts," the Maryland Court of Appeals has stated that a contract for  the performance of a public service obligation, such as providing public utilities, is a transaction affecting the public interest. *Id*. The relationship between Core and Verizon, formed pursuant to the policies and purposes behind the Telecommunications Act, supports application of the public interest exception.

The Telecommunications Act promotes competition to secure lower prices and higher quality services for telecommunication consumers.  The Act sought to replace an infrastructure of exclusive franchises with a competitive marketplace for local telephone services.  To that end, the Act required ILECs to interconnect with CLECs, to make existing facilities and networks available to CLECs so CLECs' customers could receive calls from, and place calls to, the ILECs' customers. *See Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 638 (2002).  Core and Verizon entered into an agreement pursuant to the Act.  While Core is not itself a "consumer" in the conventional sense, it furthers the interest of private consumers by interconnecting with Verizon and increasing competition in the market.  The agreement was therefore patently a "transaction affecting the public interest."  As such, the exculpatory provision absolving Verizon of any and all tort liability is void and does not bar Core from proceeding on its tort claims.

   *B. Punitive Damages*

"It is well settled in Maryland that punitive damages cannot be awarded in a pure breach

of contract case, although they are recoverable in tort actions arising out of contractual

relationships where actual malice is present." *Sims v. Ryland Grp., Inc.,* 378 A.2d 1, 4 (Md. Ct.

Spec. App. 1977) (citing, among others, *Henderson v. Maryland Nat'l Bank*, 366 A.2d 1 (Md.

1976) and *Food Fair Stores, Inc. v. Hevey*, 338 A.2d 43 (Md. 1975)); *see also Abt Assocs., Inc.

v. JHPIEGO Corp.,* 104 F. Supp. 2d 523, 537 (D. Md. 2000) (citation omitted).   Maryland

Courts define "actual malice" as "conduct of the defendant characterized by evil motive, intent to

injure, ill will, or fraud." *Darcars Motors of Silver Spring, Inc. v. Borzym,* 841 A.2d 828, 837

(Md. 2004) (quoting *Owens–Illinois, Inc. v. Zenobia,* 601 A.2d 633, 652 (Md.1992)).   Here,

there is absolutely no evidence on the summary judgment record from which a reasonable jury

could find that Verizon's actions about which Core complains were motivated by "actual

malice."

## IV.

Under Maryland law, fraudulent concealment requires five elements: "(1) the defendant

owed a duty to the plaintiff to disclose a material fact; (2) the defendant failed to disclose that

fact; (3) the defendant intended to defraud or deceive the plaintiff; (4) the plaintiff took action in

justifiable reliance on the concealment; and (5) the plaintiff suffered damages as a result of the

defendant's concealment." *Lloyd v. Gen. Motors Corp*., 916 A.2d 257, 274 (2007) (quoting

*Green v. H & R Block*, 735 A.2d 1039, 1059 (Md. 1999)).   Each element must be proven by

clear and convincing evidence.   *Rhee v. Highland Dev. Corp.*, 958 A.2d 385, 389 (Md. Ct. Spec.

App. 2008) (citing *Md. Envtl. Trust v. Gaynor*, 803 A.2d 512 (2002)).   Maryland courts have

emphasized the intent element, for this element lies at the foundation of fraudulent concealment.

"To create a cause of action, *concealment must have been intentional and effective*—the hiding

of a material fact with the attained object of creating or continuing a false impression as to that

fact.  The affirmative suppression of the truth must have been with *intent* to deceive."  *Fegeas v.*

*Sherrill*, 147 A.2d 223, 225–26 (Md. 1958) (emphasis added).

The fact that Core alleges Verizon concealed is that Core was the retail "customer of

record" to whom the multiplexer in the Baltimore Wire Center was committed.  Core contends

that if it had known that it itself was the customer of record whom Verizon asserted prevented

interconnection, it "could have demanded immediate connection" to the existing entrance

equipment.  (Core Mot. Summ. J. at 15.)

There are at least two flaws in Core's concealment theory.  First, Core has presented no

evidence that Verizon *intentionally* withheld information about the identity of the customer of

record.  Second, Core's alleged reliance on Verizon's alleged concealment was unjustified.  Core

therefore fails to prove the third and fourth elements of its concealment claim. [4]

Core argues that the Fourth Circuit has already made a factual finding that Verizon

intentionally concealed from Core the identity of the customer of record who prevented Core's

interconnection.  As a technical matter, Core's argument is misplaced.  It is a firmly established

principle of judicial review that courts of appeals do not "find" facts and that statements in the

background section of an appellate opinion hold no determinative weight.  *See Robinson v. Wix*

*Filtration Corp. LLC*, 599 F.3d 403, 419 (4th Cir. 2010) ("It is axiomatic . . . that appellate

---

[4] In terms of the first element, Core merely assumes Verizon owed Core a duty to disclose the
customer of record and fails to formally discuss or establish that that duty was independent of
Verizon's duties under the ICA.  *See Lasater v. Guttmann*, 5 A.3d 79, 102 (Md. Ct. Spec. App.
2012) ("[I]n order to prevail on [a fraudulent concealment] claim, [a plaintiff] must demonstrate
that [the defendant] owed her a duty to speak."); *see also Maryland Envtl. Trust v. Gaynor*, 803
A.2d 512, 516 (Md. 2002) ("Maryland recognizes no general duty upon a party to a transaction
to disclose facts to the other party.") (citing *Fegeas v. Sherrill,* 147 A.2d 223, 225 (Md. 1958)).  I
will, however, accept Core's assumption on the ground that a duty to disclose relevant
information is imposed not only by the ICA but also by the Telecommunications Act.

courts do not make factual findings."); *Columbus-Am. Discovery Grp. v. Atl. Mut. Ins. Co.,* 56 F.3d 556, 575–76 (4th Cir. 1995) ("It is a basic tenet of our legal system that, although appellate courts often review facts found by a judge or jury[,] . . . they do not make such findings in the first instance."); *see also Maine v. Taylor,* 477 U.S. 131, 144–45 (1986) ("[F]actfinding is the basic responsibility of the district courts, rather than appellate courts.") (internal quotation marks omitted). While it is true that the Fourth Circuit held Verizon breached the ICA and violated the interconnection requirements of the Telecommunications Act, it is erroneous to infer from this ruling that there is no genuine issue as to any material fact with respect to Core's tort claims. The factual background portion of the Fourth Circuit's case does not constitute its holding and is not part of the controlling mandate on this court.

Therefore, it is incumbent upon me to examine the summary judgment record. Examination of that record reveals that there is no evidence supporting Core's contention that Verizon's motive in not disclosing the identity of the customer of record was to deceive Core, and thereby cause a delay in interconnection. Core apparently seeks to prove intent simply by proof of Verizon's conduct. If that were sufficient, intent would not constitute a separate element of the tort of concealment under Maryland law. Moreover, there is a sound basis for inferring that Verizon's wholesale and retail divisions were highly separated and that Verizon's wholesale division, which Core worked with to interconnect, did not, in fact, know the identity of the customer of record. (Verizon Opp'n at 8) (citing 47 U.S.C. § 222(a)–(b) ("Every telecommunications carrier has a duty to protect the confidentiality of proprietary information of, and relating to, other telecommunication carriers, equipment manufacturers, and customers, including telecommunication carriers reselling telecommunications services provided by a telecommunications carrier. . . . A telecommunications carrier that receives or obtains proprietary

information from another carrier for purposes of providing any telecommunications service shall use such information only for such purpose, and shall not use such information for its own marketing efforts."). Core was aware of this structural division and that wholesale customers and retail customers were handled by different departments within Verizon. (*See* Verizon Opp'n Ex. B, Dep. of Core Principal Bret Mingo at 272:10–16 ("Mingo Dep."), 02-cv-3180 ECF No. 52-3.) By virtue of this separation, Verizon employees working with Core in a wholesale capacity may well not have had access to the allegedly concealed fact—the identity of the retail customer impeding Core's interconnection. In order for Core to prove to the contrary by a preponderance of the evidence, Core would have to present evidence that Verizon disregard the Telecommunications Act requirements regarding departmental separation to protect proprietary information. Core fails to do so.

Even if the summary judgment record could be read as supporting an inference that Verizon intentionally concealed the identity of the customer of record, Core cannot prove that it took action in justifiable reliance on the concealment. Core was itself the customer of record, and presumably it knew this fact. In 1999 Core had placed a retail order with Verizon for equipment at Verizon's Baltimore facility. (Mingo Dep. 179:15–21, 243:15–245:3, 248:18–21.) This was the same facility Core subsequently requested Verizon use to interconnect with Core as a wholesale customer. (*See* Mingo PSC Testimony at 5, Verizon Opp'n Ex. D, 02-cv-3180 ECF No. 52-5 ("At the August 11, 1999 meeting, Core and Verizon discussed implementation of Core's forecasts. I informed Verizon that Verizon's Outside Plant group had previously installed a multiplexer within Core's Baltimore Wire Center. I indicated that the multiplexer could be used to deliver interconnection trunks, as it did not appear to me that it was being used at that time for any other service. Verizon responded that it would need to check its records to see if the

multiplexer had sufficient capacity to deliver the forecasted interconnection trunks.")) Verizon then informed Core that the requested facility was assigned to a retail customer and, per Verizon's policies, the retail facility could not be used as a shared wholesale facility for carrier interconnection. (Mingo Dep. 158:19–160:4, 258:1–259:2.)

Core contends it "continued to negotiate with Verizon for interconnection to the OC-12 Loop-Ring" while the customer of record was unknown. (Core Mot. Summ. J. at 14.) Core avers that absent Verizon's alleged concealment of the customer of record, it "could have demanded immediate connection" to the existing equipment and would not have had to pursue this action in court.[5] (*Id*. at 15.) However, there is no evidence that when informed that the existing facilities it sought to use for interconnection were assigned to a retail customer, Core told Verizon that it had previously ordered services as a retail customer. (Mingo Dep. 258:1–260:12.) Nor is there evidence that Core asked Verizon whether Core itself was the assigned retail customer. (*Id*.) There was no inquiry or follow-up at all. Rather, Core states it was "mystified" and believed it was "absurd" to conclude that Core was the customer blocking its own interconnection. (*Id*.) However, when Core inspected the assigned multiplexer, there was only one DS-3 circuit connected to it. (Mingo Dep. 264:5–14). Aware that it was a retail customer at that facility, and observing only one connection and no sign of any other retail customer, Core knew or should have realized that it was the unidentified customer of record. When faced with the question, "[s]o, when you said you thought there must be another retail customer, how on earth could you have thought it was another retail customer if the only DS-3

_____

[5] Whether this amounts to sufficient "action" causing "damage" for a concealment claim as Maryland law defines those terms is another issue altogether. I need not discuss this further because Core's concealment claim fails on several other grounds. Furthermore, the actions allegedly taken in reliance on Verizon's concealment, and the harm stemming from those actions, are irrelevant when the reliance is unjustified.

plugged into [the multiplexer] was [Core's]," Core's principal professed, "I was perplexed." (Mingo Dep. 264:15–22.)  Instead of following up or inquiring as to the cause of his confusion, Mingo stated he thought "it might have been a mistake on [Verizon's] part" and that he simply "assumed" Core could not be the impeding customer of record.  (*Id*. at 264:15–265:10.)  When asked, "did you suggest to [Verizon], I think you're mistaken . . . [p]lease come and have a look and investigate," Mingo responded, "I'm not sure I did because, because I was genuinely perplexed."  (*Id*. at 266:18–267:7.) On this evidentiary record, if Core relied upon Verizon's concealment, its reliance was unjustified.

## V.

Maryland law recognizes the tort of unfair competition "to prevent dealings based on deceit and dishonesty" and provides a cause of action for "damaging or jeopardizing another's business by fraud, deceit, trickery or unfair methods of any sort." *Baltimore Bedding Corp. v. Moses*, 34 A.2d 338, 342 (Md. 1943).   Although originally applied to trademark-type cases involving "'passing off' one's own goods as those of a competitor," the scope of the tort has expanded "to all cases of unfair competition in the field of business." *Delmarva Sash & Door Co. of Maryland, Inc. v. Andersen Windows, Inc.*, 218 F. Supp. 2d 729, 733 (D. Md. 2002) (citing, among others, *Baltimore Bedding*, 34 A.2d at 342 and *Edmondson Vill. Theatre, Inc. v. Einbinder,* 116 A.2d 377, 379 (Md. 1955)).  Whether a defendant's actions amount to unfair competition depends on the particular facts of the case.  *Baltimore Bedding*, 34 A.2d at 342. There are no specific elements to the tort; rather, "each case is law unto itself, subject, only, to the general principle that all dealings must be done on the basis of common honesty and fairness, without taint of fraud or deception." *Id*.

13

The conduct upon which Core relies to support its unfair competition claim is Verizon's alleged concealment of the identity of its customer of record.  As stated in section IV of this Opinion, there is insufficient evidence on the summary judgment record to establish that Verizon did unlawfully or with improper motive conceal the identity of its customer of record. Therefore, Core's claim for unfair competition falls, just as its claim for concealment falls.

## VI.

The Fourth Circuit has ruled that Verizon breached the ICA by delaying interconnection with Core.  Therefore, with respect to Core's breach of contract claim, the only remaining questions are, as Verizon contends, (1) whether a settlement agreement between Core and Verizon in litigation in the Commonwealth of Pennsylvania precludes Core from recovering alleged damages suffered by Core in Pennsylvania resulting from conduct litigated in the present action, and (2) whether Core's damages are limited to "an amount equal to the pro rate monthly charge for the [delay] period," as provided in Section 26 of the ICA.

The settlement agreement in the Pennsylvania litigation resolved all of Core's claims against both Verizon Pennsylvania and Verizon Maryland "arising out of the subject matter of the Pennsylvania Litigation."  (Settlement Agreement ¶¶ E & B, Verizon Opp'n Ex. I, 02-cv-3180 ECF No. 52–10.)   The Pennsylvania litigation involved claims against Verizon Pennsylvania similar to the claims against Verizon Maryland in this litigation, arising out of allegedly improper delays in interconnection.  The Pennsylvania litigation did not involve a specific claim for damages to Core Pennsylvania caused by Verizon Maryland's conduct.   In

fact, there is but fleeting mention of Verizon Maryland and Verizon services more generally. Thus, the settlement agreement is not a bar to the claims asserted by Core in this action.

As discussed in section III. A., *supra*, section 26 is not enforceable to the extent that it is an *exculpatory* provision shielding Verizon from tort liability because the transactions between Core and Verizon "affect the public interest." However, the limitation of liability clause contained in section 26 may well be enforceable under Maryland law as a defense to Core's contract claim.[6] I need not decide that question, however, because I find that to the extent that section 26, as a matter of contract, seeks to preclude Core from recovering damages it suffered as a result of an unjustifiable delay in interconnection, it is unenforceable under the federal Telecommunications Act. As emphasized by the Fourth Circuit, *see Verizon Maryland*, 405 F. App'x  at 14, the purpose of the Telecommunications Act is to foster competition in local markets by prohibiting impediments to competition between incumbent carriers and other carriers who seek to enter the market. Allowing incumbent carriers to use the leverage they possess to contractually limit their liability for damages caused by creating impediments to, and thereby delaying, interconnection would frustrate this purpose. Therefore, if Core can prove that

---

[6] Core's argument that Verizon waived the ICA's damages limitation by failing to plead it as an affirmative defense in accordance with FRCP 8(c) is without merit. Core points to no authority holding a defendant in a breach of contract case is barred from relying on a limitation clause in that same contract because the limitation was not raised properly as an affirmative defense. Unlike a statute of limitations affirmative defense, or other limitation provision extrinsic to the cause of action, the damages provision here is an integral part of the contract at issue. Assuming, without deciding, that a contractual limitation of liability is an affirmative defense subject to FRCP 8(c), Verizon's failure to plead it did not prejudice Core. Core was in no way "unfairly surprised" by the limitation, a provision in the contract Core adopted voluntarily. Furthermore, no adverse consequences resulted from Verizon's failure to formally raise and discuss the limitation provision earlier since it was only after the Fourth Circuit's remand that this court focused specifically on damages.

it suffered damages in excess of what is permitted by section 26 of the ICA as a result of an

unjustifiable delay in interconnection caused by Verizon, it may do so at trial.

A separate order is being entered herewith effecting the rulings made in this Opinion.

August 10, 2012
Date

/s/
J. Frederick Motz
United States District Judge